Julian JOSEPH, et al., Plaintiffs,

v.

**UNITED STATES DEPARTMENT OF LABOR, et al., Defendants.**

**Civ. A. No. 90–3060.**

United States District Court, Dist. of Columbia.

Jan. 30, 1992.

See also 787 F.Supp. 245.

Shelley Davis, Bruce Goldstein, Washington, D.C., Robert Williams, Immokalee, Fla., for plaintiffs.

Thomas Rees, Asst. U.S. Atty., Washington, D.C., for defendants.

MEMORANDUM

GESELL, District Judge.

This is hopefully the final stage in the drawn-out controversy over the Department of Labor's ("DOL's") attempt to set a prevailing wage for seed cane cutters in the Florida sugar cane industry for the 1990–1991 harvest year. The only remaining issue before the Court is whether a group of over 100 foreign workers should be treated for purposes of DOL's calculation of the rate on remand as foreign guest workers (H–2A workers), as plaintiffs contend, see 8 U.S.C. § 1188, or as U.S. workers under the provisions relating to Special Agricultural Workers ("SAWs"), as defendants contend, see 8 U.S.C. § 1160. The classification of the workers one way or the other will move the wage calculation upward or downward, and will thus affect the recovery plaintiffs hope to obtain in further action on the matter that they contemplate taking subsequent to the remand. See Joseph v. United States Department of Labor, memo. op. at 2, 787 F.Supp. 245, 246 (D.D.C. Oct. 3, 1991) (finding the present controversy not moot). The question as to the status of these workers has been fully briefed on cross-motions for summary judgment. There are no material facts in dispute.

The statutory scheme underlying this controversy is set out in careful detail in Wint v. Yeutter, 902 F.2d 76 (D.C.Cir. 1990). In brief, foreign agricultural workers have long been able legally to obtain work in the United States under the foreign guest worker (H–2A) program. To assure that foreign workers are not taking jobs when U.S. workers were available, however, and to prevent foreign workers from depressing wages, the statute requires employers hiring H–2A workers to pay them the prevailing wage paid U.S. workers, as determined by the Department of Labor. In addition, by amendment to the immigration statute, certain special agricultural workers (SAWs) were allowed to apply for permanent residency. For pur-

poses of the prevailing wage calculation, those SAWs were to be treated as U.S. workers. See Immigration and Nationality Act, 8 U.S.C. § 1101 et seq., as amended by Immigration Reform and Control Act of 1986, P.L. 99–603; 20 C.F.R. §§ 655.-102(b)(9), 653.501(d)(4).

The current controversy arose out of another, separate controversy over whether or not sugar cane workers could qualify as SAWs at all. After protracted litigation, that issue was finally resolved by the Court of Appeals on May 4, 1990. See Wint v. Yeutter, 902 F.2d 76 (D.C.Cir.1990). In Wint, the court sustained the decision of the Department of Agriculture not to include sugar cane workers among those foreign workers eligible for permanent U.S. residency under the SAW provisions. Thus, it has been obvious at least since the decision of May 4, 1990—if not since the date of the District Court's decision affirming the Secretary, filed February 28, 1989—that as a matter of law, sugar cane workers like the 100+ workers at issue in this case cannot be treated as SAWs or SAW eligible. However, at the time the survey in the present case was made—in December 1989—as part of the wage determination for the 1990–1991 season, only the District Court decision in Wint had been issued. See Northwest Forest Workers Association v. Lyng, No. 87–1487, memo. op. (D.D.C. Feb. 28, 1989) (Hogan, J.).

Despite the fact that DOL did not decide to treat the 100+ workers at issue here as SAW-eligible until September 17, 1990—over four months after the Court of Appeals upheld the Department of Agriculture's ruling that they were not eligible—DOL contends that its determination was not arbitrary or capricious or contrary to law. On June 29, 1988, Judge Hogan granted a motion for interim relief filed by sugar cane workers—including the present plaintiffs—hoping to qualify as SAWs. Specifically, he held that, pending the final resolution of their status, those workers should not be required to file completed SAW applications or go through the application process, which included a filing fee, employment verification, and medical docu-

mentation; instead, he allowed them to file skeletal applications and remain in the country on temporary work permits. *See Northwest Forest Workers Association v. Lyng*, No. 87–1487, memo. op. at 6–8, 1988 WL 268171 (D.D.C. June 29, 1988). DOL argues that because, at the time the survey in dispute here was conducted, namely December 1990, the 100+ workers had filed skeletal SAW applications pending final outcome of the litigation regarding their status and had received temporary work authorizations (Form I–688A), they were SAW-eligible for purposes of the applicable regulations. ETA Handbook No. 398 provides that workers who have applied to be SAWs and have received I–688A's are to be treated as SAWs.

DOL's argument is without merit. The SAW applications filed by the sugar cane workers pursuant to Judge Hogan's order were not complete or accepted as complete. *See* Def. Opp. to Motion of Intervenor–Defendant (Oct. 30, 1989) at 7–8 in *Northwest Forest Workers*, Pl.Ex. 20 (INS arguing in a brief it "has not ... received completed applications from the sugar cane workers" but has allowed them to stay in its discretion pending the Court of Appeals' decision). Indeed, their only purpose was to prevent the workers from being prejudiced in the application process in case they did prevail. On February 28, 1989, however, Judge Hogan upheld Agriculture's decision not to allow sugar cane workers SAW status, and on May 4, 1990, the Court of Appeals affirmed. Thus, the applications never were completed.

The fact that the workers in the meantime were issued I–688A's is therefore irrelevant. To be treated as a SAW, according to ETA Handbook No. 398, a worker must have applied. Here, no completed applications were ever filed. Indeed, the workers were treated as foreign workers the entire time. Defendants have not disputed, for example, that the employers paid the workers in question wages comparable to those received by other domestic, as

opposed to foreign H–2A, workers, and that the employers did not pay Social Security or unemployment taxes for those workers, as they would have been required to do for U.S. workers. Indeed, the employers only took foreign-worker wage deductions from the workers' salaries. Similarly, DOL has not contested that in fact, the workers returned to Jamaica—where they were initially recruited pursuant to an H–2A certification by the employers that there were insufficient U.S. workers—at the conclusion of the season like H–2A workers, that many of them were paid some of their wages in Jamaican currency after they returned to Jamaica, and that they returned later to the United States on H–2A visas.

The entire purpose of the wage determination at stake here is to assure that foreign workers are not paid less than the prevailing wage paid U.S. workers, so that jobs will not be taken by foreign workers when U.S. workers are available. If these disputed workers are grouped, for purposes of that wage determination, with U.S. workers, when in fact they were being treated for all other purposes as foreign workers, the entire purpose of the statute would be undermined.

In conclusion, it is clear that at the time the survey was made, in December 1989, the 100+ workers at issue here were not SAWs or SAW eligible or even SAW applicants. Their applications had been disallowed by Agriculture and by the District Court in decisions that were both subsequently affirmed. Moreover, at the time DOL finally made its determination to count them as U.S. workers, it knew about all the decisions and about the legal status of the workers at the relevant time, and about the fact that they had been treated by their employers as foreign, and not U.S., workers. To treat the workers as U.S. workers only for the purpose of the wage determination, and for nothing else, is arbitrary and capricious.[1]

---

1. In addition, although it is not necessary to reach the issue, DOL's decision was also flawed because the letter it issued classifying the workers as SAWs did not consider any of the issues set forth in the present motions papers. DOL seemed to be making the determination simply by fiat.

Plaintiffs' motion for summary judgment is granted and the case is remanded to DOL to set a prevailing wage rate in accordance with the Court's Memoranda.